**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| v. | | Criminal Case No.: PWG-13-626 |
| | * | |
| **TED DUCKETT,** *et al.* | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Defendants were apprehended following a government-initiated reverse sting operation and have been charged with, *inter alia*, conspiring to commit a home invasion robbery of a drug stash house. Defendants have moved to dismiss the indictment, arguing that by fabricating a robbery scheme and using a reverse sting operation to identify and apprehend Defendants, the government engaged in conduct that is so outrageous that it violated the Due Process Clause of the Fifth Amendment. The Government has opposed the motion, arguing that a reverse sting operation is not, in and of itself, a due process violation and that government agents merely presented Defendants with a criminal opportunity, which they eagerly accepted. In light of the extremely high bar that courts have set up for claims of outrageous government conduct and the fact that the reverse sting operation falls well within the bounds of activity that courts have approved, I agree with the Government and deny the motion.

**I.   BACKGROUND**

Defendants Ted Duckett and Maurice Foster[1] each have been charged with one count of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a); one count of

---

[1] Co-defendant Donnell Williamson has entered a plea of guilty and, accordingly, has not joined the instant motion. *See* Plea Agreement, ECF No. 70.

conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846; one count of conspiracy to possess firearms in furtherance of a drug trafficking crime and a crime of violence in violation of 18 U.S.C. § 924(o); and one count of possession of a firearm in furtherance of a drug trafficking crime and a crime of violence in violation of 18 U.S.C. § 924(c); and one count of possession of a firearm by a person previously convicted of a felony in violation of 18 U.S.C. ¶ 922(g)(1).  2d Superseding Indictment, ECF No. 106.[2]

According to the parties' briefing (and confirmed by the testimony at the hearing held on January 28, 2015), in September 2013, law enforcement officers "interviewed a confidential informant (CI) regarding the CI's knowledge of crimes in Prince George's County."  Def.'s Mot. to Dismiss Indictment for Outrageous Gov't Conduct ("Def.'s Mot. to Dismiss") 2, ECF No. 52.  The CI indicated that two individuals—later determined to be Foster's co-defendants Ted Duckett and Donnell Williamson—previously had committed home invasion robberies of drug stash houses.  *Id.*

On September 24, 2013, the CI met with Duckett and told him that he knew an individual who was looking for help robbing a drug stash house.  *Id.*  Duckett indicated that he was ready and, on October 10, 2013, was introduced to an ATF undercover agent (the "UC") to discuss details of the stash house robbery.  Gov't's Consolidated Resp. to Defs.' Mots. ("Gov't's Opp'n") 2, ECF No. 73.  Duckett indicated that he had a crew that could carry out the robbery and access to firearms.  *Id.*  On October 11, 2013, Duckett and Foster met with the UC at a TGI Friday's in a meeting that was recorded.  *Id.*  Duckett said that "he and his crew knew how to commit these types of robberies," and that if the UC "had no connection to the armed guards, the

---

[2] At the time of the hearing on the instant motions, Duckett and Foster had not yet been arraigned on the Second Superseding Indictment.  They since have been arraigned before Magistrate Judge Charles B. Day and have pleaded not guilty to all counts.

robbery could be done 'with force,'" and therefore would require less planning. *Id.* Duckett also asked several questions about whether the individuals inside the stash house would be armed or could be expected to fire their weapons when the stash house was entered. *Id.* at 3. The October 11 meeting was the first time that law enforcement encountered Foster. Def.'s Mot. to Dismiss 3–4.

At a recorded meeting with Duckett and Williamson on October 23, 2013, the UC further explained the details of the purported robbery and informed Defendants that he did not have any weapons, at which point Williamson said, "we got, we got." Gov't's Opp'n 3. Williamson also asked, "do you want it to be clean? Do you want them [the people inside the stash house] to stay alive?" *Id.* When told it did not matter, he responded, "enough said, enough said." *Id.* The UC asked whether Foster would be involved in the robbery and Duckett indicated that he would. *Id.* During a recorded telephone call between the UC and Duckett on October 29, 2013, Duckett confirmed that he, Foster, and Williamson still intended to rob the stash house. *Id.* at 3–4.

On October 29, 2013, Duckett, Foster, and Williamson met with the UC in a parking lot in Laurel, Maryland, from which they followed the UC to the rental car to be used for the robbery. *Id.* at 4. Defendants put their guns in the trunk of the UC's car. *Id.* Once the group arrived at the location of the rental car, Defendants were arrested and officers recovered three handguns from the trunk of the UC's car, as well as three black skull caps, a black balaclava, and a black ski mask. *Id.*

Foster has filed, *inter alia*, a Motion to Dismiss Indictment for Outrageous Government Conduct ("Def.'s Mot. to Dismiss"), ECF No. 52, arguing that the government's involvement in the reverse sting operation through which he was apprehended violated his rights under the Due Process Clause of the Fifth Amendment. The Government has filed an opposition ("Gov't's

3

Opp'n"), ECF No. 73, and Foster has replied ("Def.'s Reply"), ECF No. 74. Duckett has filed a motion to adopt the Motion to Dismiss, ECF No. 67, and a reply to the Government's Opposition ("Duckett Reply"), ECF No. 76.

A motions hearing was held before me on Wednesday, January 28, 2015, at which Defendants introduced testimony from ATF Special Agent Noah Slackman of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and Lieutenant Patrick Hampson of the Prince George's County Police Department. Special Agent Slackman testified that he was the government's co-case agent with respect to the Defendants. He said that he was present at a debriefing of the CI, whose primary contact was Lieutenant Hampson, and that he was told that "Ted" and "Fresh"—later determined to be Duckett and Williamson—were involved in numerous crimes including home invasion stash house robberies. After speaking with the CI, Special Agent Slackman investigated Duckett and Williamson's criminal history and recorded the results of that investigation in a Report of Investigation, Defs.' Ex. 18. According to the investigation, Duckett had been:

- charged in Maryland in 2004 with grand theft/car theft and theft of over $500 in value and convicted of unauthorized use of a motor vehicle, malicious destruction of property valued over $500, and violation of probation;

- charged in Maryland in 2005 with second-degree assault and fourth-degree burglary;

- charged in Maryland in 2008 with first-degree assault, second-degree assault, use of a handgun in furtherance of a crime of violence, reckless endangerment, and conspiracy, reduced from an original charge of attempted first-degree murder;

- charged in the District of Columbia in 2009 with fugitive from justice and convicted of possession of cocaine; and

- charged in Maryland in 2011 with obstruction and hindering and false statement to officer.

*Id.* at 1. Williamson had been:

- charged in Maryland in 2007 with robbery with a deadly weapon, first-degree assault, use of a handgun in furtherance of a crime of violence, theft over $500 in value, carrying a handgun, and conspiracy;
- charged in Maryland in August 2009 with trespass on posted property;
- charged in the District of Columbia in October 2009 with assault with a dangerous weapon—gun and convicted of carrying a pistol without a license;
- charged in Maryland in December 2009 with first-degree murder and use of a handgun in furtherance of a felony or violent crime and convicted of first-degree assault;
- charged in Maryland in 2010 with first-degree assault;
- charged in Maryland in 2012 with first-degree assault; and
- charged in the District of Columbia in 2013 with failure to exhibit permit.

*Id.* at 2. Slackman also acknowledged that Foster was not an original target of his investigation and was not known to him until the meeting at TGI Friday's on October 11, 2013.

Lieutenant Hampson testified that he was the primary contact for the CI beginning in late August 2013 and had referred him to Special Agent Slackman in early September 2013. Hampson testified about having investigated a home-invasion robbery of a drug stash house committed by an individual named Kendrick Ford. According to Hampson, several calls were placed to Duckett from the scene of that robbery that appeared to indicate his involvement in the robbery, but Duckett never was prosecuted for that robbery. **[ REDACTED ]**

5

**[ REDACTED ]**

At the close of the testimony, I heard arguments from counsel. Among the issues raised by Defendants was their claim that the government's conduct was "outrageous" because (1) the fact that the quantity of drugs that government agents represented was present in the stash house served no purpose other than to increase the sentence given to Defendants, and (2) there never was an actual stash house or any real quantity of drugs. In response, the Government argued that telling targets that a large quantity of drugs existed was necessary to ensure that only serious, violent criminals likely would be interested in the proposed stash-house robbery. Following argument, I explained from the bench why I was denying the motion to dismiss and indicated that I would explain my reasoning further in this memorandum opinion.

## II.  DISCUSSION

The notion that outrageous government conduct can violate the Due Process Clause of the Fifth Amendment has its roots in the Supreme Court's entrapment decisions, in which the Court recognized that "the federal courts have an obligation to set their face against enforcement of the law by lawless means or means that violate rationally vindicated standards of justice, and to refuse to sustain such methods by effectuating them." *Sherman v. United States*, 356 U.S.

369, 825 (1958). The Supreme Court first stretched that reasoning beyond the narrow scope of an entrapment defense in *United States v. Russell*, 411 U.S. 423 (1973), in which it recognized the possibility that it "may some day be presented with a situation in which the conduct of law enforcement is so outrageous that due process principles would absolutely bar the government form invoking judicial processes to obtain a conviction." *Id.* at 431–32 (citing *Rochin v. California*, 342 U.S. 164 (1952)).

However, neither the Supreme Court nor the Fourth Circuit has dismissed any case based on outrageous governmental conduct. In *Russell*, a government agent offered to supply known manufacturers of methamphetamine with phenyl-2-propanone, a necessary and difficult-to-obtain chemical for methamphetamine production, in exchange for one-half of the quantity produced. *Id.* at 425. The defendants produced a quantity of methamphetamine using government-supplied propanone, some of which was given to the government agent and some of which was kept by the defendant. *Id.* at 426. Upon executing a search warrant, agents found an additional bottle of propanone that had not been supplied by the government. *Id.*

The Supreme Court, in an opinion written by then-Associate Justice Rehnquist, found that the "contribution of propanone to the criminal enterprise already in process was scarcely objectionable" because the chemical—though difficult to obtain—was legal and the defendants had been obtaining it elsewhere as well. *Id.* at 432. The Court also noted that such sting operations are necessary law enforcement tools because the manufacture of drugs is a continuing enterprise but that "the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task." *Id.* The Court's opinion was issued over a spirited dissent written by Justice Stewart and joined by Justices Brennan and Marshall, who took the view that "the Government cannot be permitted to instigate the commission of a criminal offense in order to

7

prosecute someone for committing it." *Id.* at 439 (Stewart, J., dissenting) (citing *Sherman*, 356 U.S. at 372).

In *Hampton v. United States*, 425 U.S. 484 (1976), the Court narrowed the outrageousness doctrine alluded to in *Russell*, holding that "[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the Defendant." *Id.* at 490. In *Hampton*, a government informant was approached by the defendant, who noticed track marks on the informant's arm and said that he needed money and knew where to obtain heroin. *Id.* at 486. The defendant met with the informant and two DEA agents posing as drug dealers to arrange drug sales on multiple occasions, after which the defendant was arrested. *Id.* The Court explained:

> To sustain petitioner's contention here would run directly contrary to our statement in *Russell* that the defense of entrapment is not intended "to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve. The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations."

*Id.* at 490 (quoting *Russell*, 411 U.S. at 435).

In the Fourth Circuit, the principal case on government outrageousness is *United States v. Goodwin*, 854 F.2d 33 (4th Cir. 1988), in which the government identified likely purchasers of child pornography by targeting persons to whom such material had been sent from overseas. Those targeted were sent catalogs from a government-created company advertising child pornography. *Id.* at 34. After the defendant responded to the government's advertisements by, *inter alia*, ordering child pornography and sending a check to the address provided, the government provided actual "visual depictions of sexually explicit conduct" involving minors to the defendant. *Id.* at 35. After the material was delivered, postal inspectors executed a search

warrant on the defendant's house and recovered the correspondence with the government-created entity that was advertising child pornography, as well as "a large volume of nudist and sexually explicit material depicting children as well as adults." *Id.* at 36.

The Fourth Circuit found that "[o]utrageous is not a label properly applied to conduct because it is a sting or reverse sting operation involving contraband," *id.* at 37, and that:

> [t]he government's involvement in this case is substantially less than in *Hampton* . . . . The postal inspectors never dealt with Goodwin personally or through an informant. They dealt with him through the mails. Further, we note our agreement with the district court's admonition that the due process calculation must consider the nature of the crime involved. Congress recognized that "the production, distribution and sale of child pornography is often a clandestine operation." [The reverse sting operation] provides a means by which consumers of this secret, criminal material can be detected. As applied to Goodwin, [this] was neither shocking nor offensive to traditional notions of fundamental fairness.

*Id.* Similarly, the robbery of a drug stash house often happens beneath the radar of law enforcement officers. Because the victims of such a robbery are, themselves, often armed and violent criminals, they are unlikely to report the robbery of drugs or drug money to the police or to aid in criminal investigations. Indeed, according to Lieutenant Hampson, Duckett appears to have been involved in at least one earlier stash house robbery in which officers were not able to develop sufficient evidence to successfully charge him. But because such robberies often are violent and take place in residential areas, they pose a particular danger to the public.

Moreover, in *United States v. Hasan*, 718 F.3d 338 (4th Cir. 2013), the Fourth Circuit recently rejected an outrageousness challenge to a conviction arising out of the sale of contraband cigarettes and noted that "[a]fter *Hampton*, the 'outrageous conduct doctrine survives in theory, but is highly circumscribed." *Id.* at 343. There is nothing unique about this case that separates it from the myriad cases in which an outrageousness claim has been rejected.

Defendants rely heavily on *United States v. Milam*, 817 F.2d 1113 (4th Cir. 1987), in which an individual named Cartwright approached a government informant for help in setting up a counterfeiting operation, and an undercover agent "helped transport a printing press, provided counterfeit printing plates, bought the necessary paper, and provided some technical assistance to [the defendant]." *Id.* at 1114. After the defendants sought to cut Cartwright out of the deal, the government pursued Cartwright and the *Milam* defendants separately, eventually arranging a sale of counterfeit currency to the defendants. The court rejected an outrageousness challenge even though the government provided a considerable, if not decisive, degree of assistance in the defendants' illegal activity, noting that "the illegal activity did not originate with the government or its informant," but that the defendants had approached the informant. *Id.* at 1115.

Foster focuses on the court's statement, in dicta, that "[t]he government's conduct might warrant due process analysis in an appeal of Cartwright's conviction." *Id.* at 1116; Def.'s Mot. to Dismiss 8–9. Unlike the defendants in *Milam*, the government provided substantial assistance to Cartwright in helping him to set up a counterfeiting operation, *Milam*, 817 F.2d at 1116, and Foster argues that this case is analogous because the government initiated contact with Defendants and provided all of the details about the planned stash-house robbery, Def.'s Mot. to Dismiss 10. However, this stretches *Milam*'s offhand dicta too far—the court actually was dismissing the notion that the government's involvement in Cartwright's case affected whether its conduct was outrageous with respect to the *Milam* defendants, and was not predicting the likely outcome of an appeal that never was taken. And even a charitable reading of the court's gratuitous suggestion that the government's involvement in Cartwright's case "might warrant due process analysis" does not suggest that such a claim ultimately would succeed. *Milam*, 817 F.2d at 1116.

Rather, "the appellate courts have over time continued to demonstrate a high shock threshold in the presence of extremely unsavory government conduct." *United States v. Osborne*, 935 F.2d 32, 36 (4th Cir. 1991). In *Milam*, the Fourth Circuit flatly rejected the argument that government activity is outrageous where the government is directly involved in trafficking in contraband. *Milam*, 817 F.2d at 1116; *cf. Hasan*, 718 F.3d at 344 (upholding conviction where untaxed cigarettes excluded from definition of "contraband" when possessed by government agents and Congress expressly authorized law enforcement "to conduct commercial endeavors in the context of undercover investigations"). And courts also have rejected outrageousness claims even where the government directly was involved in the actual distribution of drugs, *see, e.g.*, *Russell*, 411 U.S. at 426, or child pornography, *see, e.g.*, *Osborne*, 935 F.2d at 37; *Goodwin*, 854 F.2d at 35. In one case, the Ninth Circuit even rejected a challenge where the FBI manipulated a prostitute into entering a sexual relationship with the target of an investigation, finding that to hold such actions to be outrageous as a matter of law would be unduly subjective in light of the wide range of deceptions that occur in undercover investigations. *See United States v. Simpson*, 813 F.2d 1462, 1466–67 (9th Cir. 1987). In light of the courts' longstanding antipathy toward claims of government outrageousness, it is hard to find the reverse sting operation here to be outrageous.

In a nearly identical case, Judge Quarles recently rejected an outrageousness challenge to a reverse sting operation involving a purported stash-house robbery in *United States v. Davis*, No. WDQ-13-0002, 2013 WL 4026969 (D. Md. Aug. 6, 2013). In that case, a government informant approached the defendants, three members of the Black Guerilla Family gang, for assistance in a stash-house robbery. *Id.* at *1. The defendants discussed the logistics of the robbery, "'were all attentive and participating in the conversation' and 'expressed interest in

11

committing the robbery.'" *Id.* When asked if he was willing to commit the robbery, one of the defendants responded enthusiastically, stating that such robberies "'make my day . . . this my line of work,'" and that he was "'with that [the robbery] a 100 [100%] committed.'" *Id.* (ellipsis and alterations in original). The defendants were arrested when they showed up to meet the confidential source on the day of the purported robbery. *Id.* at *2. Judge Quarles rejected the outrageousness challenge on the grounds that "Government informants presented a criminal opportunity to the Defendants, which they accepted. This circumstance is neither 'shocking' nor 'offensive to traditional notions of fundamental fairness.'" *Id.* at *5 (quoting *Osborne*, 935 F.2d at 37). The same reasoning applies with equal force in this case.

     Defendants' primary argument does not appear to be that a reverse sting operation intrinsically is outrageous, but rather that this investigation was outrageous because the government lacked a sufficient particularized basis to investigate these Defendants. Duckett relies on *United States v. Thorne*, No. 3:13-cr-00293-MOC-DCK, 2014 WL 4700687 (W.D.N.C. Sept. 22, 2014), in which the Western District of North Carolina rejected an outrageousness challenge following a "two-day evidentiary hearing" to argue that, at the very least, an exhaustive investigation of the motivations of the government in targeting Defendants is required here. The mere fact that another court spent substantial time on a similar legal issue does not make a lengthy hearing necessary in this case, though. The Fourth Circuit expressly has rejected the notion "that constitutional norms are violated when, without reasoned grounds, officers approach apparently innocent individuals and provide them with a specific opportunity to engage in criminal conduct." *Osborne*, 935 F.2d at 35. This undermines the need to probe what basis, if any, the CI had for identifying Defendants to the government; from a constitutional standpoint,

the UC could have approached Defendants sight unseen and offered them the opportunity to participate in a robbery without *any* particularized basis.

And even if, as Defendants argued, *Osborne* no longer reflects the consensus among appellate courts (and notwithstanding that it remains good law in this circuit), it also is apparent that the government had a sufficient basis to investigate Defendants here.  The CI expressly identified Duckett and Williamson as individuals who participated in armed home invasion robberies, and Special Agent Slackman verified that both had substantial rap sheets involving numerous charges for violent crimes.

**[ REDACTED ]**

Though it may be possible to conceive of a case in which government agents employed Machiavellian means to harass or entrap a wholly innocent person that due process would be offended, this plainly is not that case.  And even if it were otherwise, Defendants still would be able to assert an entrapment defense, which—thus far—they have decided not to do.

Indeed, the Fourth Circuit never has reversed a conviction on the basis of outrageous government conduct and "[o]nly the Third and Ninth Circuits have reversed convictions on due process grounds."  *Milam*, 817 F.2d at 1115.  The cases in which they did easily are distinguishable from this one, and the Fourth Circuit has recognized that such cases involved either "counterfeiting or drug manufacturing operations in which government agents or informants were heavily involved; [or] those in which government agents sold drugs or supplied drugs for sale by defendants." *Id.*

In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), the Third Circuit found that the government acted outrageously when an informant seeking to reduce his sentence, acting at government behest, approached an individual named Neville and proposed a methamphetamine-

13

manufacturing operation. *Id.* at 375–76. The court found no indication that Neville was predisposed to manufacture methamphetamine or that anybody involved "had the means or the money" to do so without government assistance. *Id.* at 380–81. The prosecution of another defendant, Twigg, was even more problematic because he had known little if anything about the nature of the operation and simply was performing favors because he owed a debt to Neville. *Id.* at 382. Even if *Twigg* were good law in the Fourth Circuit, it does not appear that Defendants can show that they were not predisposed to commit stash house robberies (nor do they even argue that they were not) or that the government provided all of the necessary knowledge or resources to do so.

In *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), the Ninth Circuit overturned a conviction for bootlegging notwithstanding defendants' past bootlegging activity where, *inter alia*, an undercover government agent approached defendants based on their past conviction for bootlegging, pressured them into producing bootleg alcohol, and was the only customer of the bootlegging operation. *Id.* at 786–87. The Ninth Circuit held that "when the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which make entrapment repugnant to American criminal justice are operative." *Id.* at 787. It is particularly notable that *Greene* pre-dates *Hampton* and does not appear to comport with Fourth Circuit precedent confining the outrageousness doctrine to a vanishingly narrow scope.

Foster's motion also relied on *United States v. Hudson*, 3 F. Supp. 3d 772 (C.D. Cal. 2014), in which the Central District of California dismissed an indictment for outrageous governmental conduct with respect to a reverse sting operation aimed at stash-house robberies, finding that such an operation "transcends the bounds of due process and makes the Government

14

'the oppressor of its people.'" *Id.* at 788 (quoting *United States v. Black*, 733 F.3d 294, 318 (9th Cir. 2013)). However (as Foster acknowledged in his Reply), that case was reversed in November in *United States v. Dunlap*, ---- F. App'x ----, 2014 WL 6807733 (9th Cir. Nov. 20, 2014), in which the Ninth Circuit noted "that similar reverse-sting operations, if properly conducted, are a permissible law enforcement tactic," and observed that, as in this case, "[o]nce the bait was set, Defendants 'responded with enthusiasm.'" *Id.* at *1.

Defendants also have urged me to consider this case according to the factors recently enunciated by the Ninth Circuit in *United States v. Black*, 733 F.3d 294. Although the Ninth Circuit's test has not yet expressly been adopted by other circuits (and the Fourth Circuit expressly has declined to follow Ninth Circuit authority on this issue), it provides a useful framework for considering claims of governmental outrageousness, albeit one that ultimately is unavailing to Defendants. According to the Ninth Circuit, the relevant considerations are:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue. In this case, the first three are most relevant to the way in which the government set up the sting; the fourth and fifth look to the propriety of the government's ongoing role in the sting. The last focuses on the justification for the particular law enforcement strategy employed. These do not constitute a formalistic checklist, but help focus our analysis of the totality of the circumstances.

*United States v. Black*, 733 F.3d 294, 303 (9th Cir. 2013).

Were I to consider this case in light of the *Black* factors, the first factor weighs in favor of the Government: Duckett specifically was identified as somebody who had committed stash-house robberies in the past and Defendants' Exhibit 18 sets forth a long list of crimes committed or believed to have been committed by Duckett and Williamson. The second factor,

"individualized suspicion," is close: this is not a case in which the government "had reason to suspect an individual or an identifiable group before initiating a sting operation," *id.* at 304, nor is it one in which the government simply reached out into a place where it believed criminal activity was likely, *id.* at 305. However, any concerns under the second factor may be mitigated where the defendants "told [the CI] very early and often that they had engaged in similar criminal activity in the past," *id.* at 307, and so the second factor does not weigh heavily in my consideration. And although it is true that the government had no individualized suspicion with respect to Foster at this point, that cannot weigh in my consideration because Foster was not targeted by the investigation; he simply had the bad fortune to agree to be brought into the conspiracy by Duckett and Williamson. The third factor weighs in favor of Defendants because the government entirely fabricated the alleged conspiracy and arranged for Defendants to be recruited. *Id.* at 305. Not only could Defendants not have committed a crime without government assistance, but in this case, the crime did not exist outside of the minds of government agents.

The fourth factor, government encouragement or coercion, weighs in favor of the Government where "the government proposed the stash house robbery, and the defendants eagerly jumped at the opportunity." *Id.* at 308. This is not a case in which the government dangled an irresistible opportunity or an eye-boggling amount of cash in front of Defendants; it merely offered the opportunity to participate in a violent but potentially lucrative crime. Moreover, as the Government explained at the hearing, the manner in which the crime was presented was designed to highlight its dangerous nature and therefore to scare away all but the most violent criminals. Simply offering a criminal opportunity is not, itself, outrageous. Similarly, the nature of the government's participation, under the fifth *Black* factor, was

16

minimal: after the initial pitch, the government deferred to Defendants on methods and planning and Defendants were more than willing to discuss specifically violent conduct in reference to the crime. *Id.* at 308–09. Finally, the nature of the crime being investigated weighs strongly in favor of the Government because "stash house robberies are largely unreported crimes that pose a great risk of violence in residential communities." *Id.* at 309. This factor is highlighted here because law enforcement officers already had reason to believe that Duckett had committed stash house robberies for which they could not develop sufficient evidence to prove his participation beyond a reasonable doubt.

Accordingly, although the third *Black* factor weighs in favor of Defendants and the second is entitled to minimal weight either way, the remaining factors all favor the Government and militate against a finding of outrageous governmental conduct and buttress my conclusion based upon Fourth Circuit law that the reverse sting operation used here does not offend due process. However, the *Black* court also noted that in a case such as this,

> because the operation is fake, we must remain vigilant that the government does more than set the 'bait' and create criminal convictions by outrageous means. We emphasize that in this case, the existence of tape and video recordings to prove what was actually said and done has weighed heavily in our review of the record.

*Id.* at 309–310. Here, as well, there are audio recordings of the interactions between Defendants and government agents that will demonstrate what actually happened and diminish the likelihood that the Government will be able to prove the conspiracy it alleges by presenting a jury with evidence that is inaccurate, taken out of context, or fabricated.

While courts must remain vigilant against government overreach, there is no indication that government agents did anything here besides presenting Defendants with a purported criminal opportunity on which they eagerly seized. The government did not threaten or coerce Defendants, attempt to overbear their will, or goad them into actions that they appeared

unprepared or unwilling to take on their own.  Particularly in light of the exceedingly high bar set by the appellate courts, the dangerous nature of home invasion robberies of drug stash houses, the difficulties inherent in prosecuting such crimes, and the relatively low probability that an otherwise innocent person would sign on for such a dangerous criminal endeavor, there simply is no basis to find that the reverse sting operation used here was improper, much less that it shocks the conscience of the Court or is so outrageous as to offend due process.  Accordingly, the motion to dismiss must be denied.

### III.    CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss Indictment for Outrageous Government Conduct, ECF No. 52, is DENIED, and Duckett's Motion to Join Defendant Foster's Motion to Dismiss, ECF No. 67, also is DENIED.

It is so ordered.

Dated: January 29, 2015                                          /S/
                                                                                Paul W. Grimm
                                                                                United States District Judge

dsy